BALL, BALL AND BROSAMER, INC. AND BALL AND BROSAMER, J.V., A JOINT VENTURE, BALL, BALL AND BROSAMER, INC., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ball, Ball & Brosamer, Inc. v. Commissioner
Docket No. 3553-87
United States Tax Court
T.C. Memo 1990-454; 1990 Tax Ct. Memo LEXIS 498; 60 T.C.M. (CCH) 587; T.C.M. (RIA) 90454; August 22, 1990, Filed *498 Decision will be entered for the petitioner. Fielding H. Lane and Mary Eileen Butler, for the petitioner. James W. Clark, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION In his Final Partnership Administrative Adjustment, respondent determined that the partnership failed to include $ 3,391,053 in gross income attributable to the completion of a long-term contract in 1983. The sole issue to be decided is whether Job 553, a heavy construction job, was completed for Federal income tax purposes under the completed contract method of accounting in 1983 or 1984. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached are incorporated by this reference. Ball, Ball *499 & Brosamer, Inc. is the tax matters partner of Ball, Ball & Brosamer, Inc. and Ball & Brosamer, J.V., the partnership. The tax matters partner had its principal place of business in Alamo, California, at the time the petition was filed. The partnership used the calendar year as its annual accounting period and elected to report the income from its long-term contracts pursuant to the completed contract method of accounting. The partnership commenced business in January, 1981, and was engaged in heavy construction work, particularly for government agencies. Job 553, whose completion is the subject of this opinion, was performed pursuant to a contract between the partnership and the United States Department of the Army, Corps of Engineers. The contract was part of a $ 500 million project for the construction of a space shuttle complex at Vandenberg Air Force Base. This complex included, among other things, a space shuttle launch facility, a space shuttle maintenance check out facility, and a space shuttle mate/de-mate facility. As part of the overall project, the partnership's specific contractual obligations were as follows:
Removal of existing bituminous runway pavement and *500 replacement with concrete pavement; concrete runway extension overruns and shoulders; airfield lighting and NAVAIDS; regulator building; drainage; utility relocation; laser tracking system; and other appurtenant work; towway (V-80 partial); apron (V-19); all on North Vandenberg Air Force Base, California. Funding for the construction of the space shuttle complex was provided by a number of different appropriations authorized by Congress for the different facilities or aspects of the project. As part of the Government's management of the construction of the space shuttle complex, the Government "packaged" the various types or items of work required for construction of the different space shuttle facilities into contracts to provide efficient work units, using parts of the different Congressional appropriations to fund the work included within each contract. This packaging was done based on the Government's determination of how best to accomplish the desired work, how best to minimize disruptions, and how best to obtain the most competitive or best price for the work. The partnership bid all of the work in the contract as a unit for an initial contract price of $ 19,976,745. The *501 partnership determined the bid prices for the various items of work included in the contract by spreading the contract price or total costs for performance of the contract as a whole, including mobilization, equipment, and other costs. During the course of the partnership's work on the contract, 57 written modifications to the contract were issued reflecting various changes in the work ordered by the contracting officer, which increased the total consideration that was received by the partnership to $ 22,152,866.50. Payments were based upon estimates, approved by the Contracting Officer, of the partnership's progress on the job. The performance report for the period ending December 31, 1983, reflected that all elements of the contract were approximately 100 percent complete. Construction of all elements of the shuttle facility at Vandenberg Air Force Base was not projected to be completed until 1985, although the contract between the partnership and the Government required the partnership to complete the contract by September 10, 1983, before change orders. Part of the partnership's contractual obligations was to build an additional 7,000 feet of concrete runway, plus extensions *502 and overruns; in addition, the partnership was to remove 6,000 of the existing 8,000 feet of runway and rebuild it with concrete. Petitioner initially built the new runway, leaving the old one open for aircraft usage. After the new runway was completed, the petitioner then closed, removed, and rebuilt the old section. The entire 15,000 foot runway was sufficiently completed for use by aircraft for landing and takeoff by the summer of 1983. The Air Force took beneficial occupancy of the runway, apron, and appurtenant facilities in September 1983, and placed them in regular service at that time. As part of the contract, the partnership was required to relocate Tangair Road on Vandenberg Air Force Base because the old road came too close to a space shuttle check-out facility, which was deemed to be a possibly hazardous facility. The work on Tangair Road was initially completed in 1982, and the road was heavily traveled. Problems became apparent with the new road as it began to deteriorate, and it was closed in 1983 so that petitioner could perform additional work. Tangair Road was reopened in May 1983, after petitioner made modifications. Even after the additional work, questions *503 were again raised as to whether Tangair Road conformed with the contract. Discussions as to its conformance continued until 1984 and ended after petitioner agreed to increase the thickness of a portion of Tangair Road, at no cost to the Government. This work was completed in the summer of 1984. As of the end of 1983, the partnership had also not yet completed the removal of existing curbing in an apron area near the mate/de-mate facility and the paving in that area to provide adequate room to allow a 747 jet to turn around. In addition, the partnership also had not installed shields on the runway lights, provided for a remote switch to operate a generator from the tower, or painted numbers on power poles near the runway. The Government requested at the end of 1983 that petitioner submit a proposal to flush epoxy the center line touchdown zone cover plates, within the runway concrete pavement. Petitioner eventually submitted a proposal, which was rejected in 1984 on the grounds that it was too expensive. The partnership received a letter from Edward M. Grigsby, a representative of the Contracting Office, stating that the Government considered the project completed and accepted *504 in March 1984. OPINION The partnership reported its income from long-term contracts, including Job 553, under the completed contract method of accounting allowed by section 1.451-3, [1] Income Tax Regs. Under that method, income derived from long-term contracts is calculated and reported in the year in which the contract is completed. As provided in section 1.451-3(b)(2), "completion" means: (2) Completion -- (i) Final completion and acceptance -- (A) General rule. Except as otherwise provided in this paragraph (b)(2), * * * a long-term contract shall not be considered "completed" until final completion and acceptance have occurred. Nevertheless, a taxpayer may not delay the completion of a contract for the principal purpose of deferring Federal income tax. (B) Completion determined on basis of all *505 facts and circumstances. Final completion and acceptance of a contract for Federal income tax purposes is determined from an analysis of all the relevant facts and circumstances, including the manner in which the parties to the contract deal with each other and with the subject matter of the contract, the physical condition and state of readiness of the subject matter of the contract, and the nature of any work or costs remaining to be performed or incurred on the contract. In considering the manner in which the parties deal with the subject matter of the contract, any use of the primary subject matter of the contract by the purchaser (except for testing purposes that produce no gross revenue, cost savings, or other substantial benefits for the purchaser) will be considered. Petitioner argues that final completion and acceptance did not occur until the work that was done in 1984 was finished and that the Government did not formally accept the partnership's work until 1984. The contract, in petitioner's words, constituted a single, nonseverable contract, and the work remaining to be performed on the contract after 1983 was not severable from the balance of the contract. Petitioner *506 claims that under the final completion and acceptance standard set forth in section 1.451-3, final completion of the contract -- not just substantial completion -- must have occurred. Petitioner cites E. E. Black, Ltd. v. Alsup, 211 F.2d 879 (9th Cir. 1954), in which the taxpayer contracted to construct a housing project. The contract provided for final payment when the construction was completed and accepted by the client. The client withheld $ 533.50 until the contractor installed thermostat units for the fire alarm system in the project's community building, which were not installed until the next tax year. In holding for the taxpayer, the Court of Appeals for the Ninth Circuit held that the contract was not completed until every last part of the job was completed. Petitioner also claims that acceptance by the owner of the completed work must also have occurred. Petitioner cites Thompson-King-Tate, Inc. v. United States, 296 F.2d 290 (6th Cir. 1961), in which a taxpayer's income derived from work on a housing project was not included in gross income until the year in which it was finally accepted by the housing authority. While we agree that *507 these earlier cases support petitioner's contention that Job 553 should not be considered completed until tax year 1984, our ability to rely on them for their definition of final completion and acceptance may be constrained by the modification of that term by regulation promulgated pursuant to the Tax Equity and Fiscal Responsibility Act of 1982, (TEFRA), Pub. L. 97-248, 97th Cong., 96 Stat. 324. Section 229 of TEFRA specifically provides that, "The Secretary of the Treasury shall modify the income tax regulations relating to accounting for long-term contracts to -- (1) clarify the time at which a contract is to be considered completed." The purpose of this legislation was to cause the regulations to be amended to "prevent unreasonable deferral of recognition of income by reason of contract provisions that are merely incidental to the contract obligation for construction, installation, or manufacturing." H. Rept. 97-760 (Conf.) 549 (1982), 1982-2 C.B. 600, 637-639. The modified regulations, in section 1.451-3(b), Income Tax Regs., apply with respect to taxable years ending after December 31, 1982. The amended regulation, in section (b)(2)(i)(C) thereof, further seeks *508 to illustrate the definition of final completion and acceptance through the familiar use of examples: (C) Examples. The principles of paragraph (b)(2)(i) of this section are illustrated by the following examples: Example (1). In 1982, A, a calendar year contractor, contracts with B to construct a building. The initial completion date specified in the contract is October 1984. In November 1984, the building is completed in every respect necessary for the use for which the building is intended. Later in November 1984, B occupies the building and notifies A that certain minor deficiencies should be corrected. A agrees to correct the deficiencies. Under these circumstances, the contract is considered completed for Federal income tax purposes in A's taxable year ending December 31, 1984, without regard to when A corrects the deficiencies. The contract is considered completed because the parties have dealt with each other and with the subject matter of the contract in a manner that indicates that final completion and acceptance have occurred. Example (2). Assume the same facts as in example 1, except that there are no deficiencies in the building that require correction or *509 repair. In addition, assume that the contract between A and B provides that none of the retainage under the contract may be released to A until A obtains an architect's certificate that the building has been completed according to the specifications of the contract. A obtains this certificate in February, 1985. Under these circumstances, the contract is considered completed for Federal income tax purposes in A's taxable year ending December 31, 1984, without regard to when A obtains the required architect's certificate, and without regard to when the retainage is released to A, because the parties have dealt with each other and with the subject matter of the contract in a manner that indicates that final completion and acceptance have occurred. Example (3). In 1982, X, a calendar year taxpayer who manufacturers industrial machinery, contracts with F to build and install one large item of industrial machinery to be delivered in August 1983 and to be installed and tested by X in F's factory. The contract provides that the machinery will be accepted by F when the tests performed by X demonstrate that the machinery will perform within certain environmental standards required by *510 a government agency, regardless of whether an operating permit has been obtained. Because of technical problems the machinery is not ready for delivery until December 1983. F accepts delivery of the machinery in December 1983 subject to installation and testing to determine if the assembled machinery meets the environmental standards. The machinery is installed and tested during December 1983 through February 1984, and F accepts the machinery in February 1984. An operating permit required to operate the machinery under the environmental standards is issued by the governmental agency in February, 1985. Under these circumstances final completion and acceptance of the machinery for Federal income tax purposes occurs in February, 1984. Example (4). In 1983, D, a calendar year taxpayer, contracts with E to construct a shopping center and related parking areas. The shopping center is completed in October 1985. In December 1985, the shopping center and three-fourths of the parking area are opened to the general public. At that time, the entire parking area of the shopping center has been graded and three-fourths has been paved, but the final asphalt coating has not been laid due *511 to general weather conditions. Under these circumstances, the contract to construct the shopping center and parking area is considered completed for Federal income tax purposes in December 1985, because the shopping center and a major portion of the parking area were ready to be used and were used at that time. The regulations concerning the completed contract method and the definition of the "completed" contract were amended pursuant to legislative mandate in 1982 as the Congress sought to end abuses in completed contract accounting. Congress directed the Treasury to promulgate regulations, supra, which considered the substance of the contract, not the mere form. The above examples, while not exhaustive, make the point that the existence of deficiencies that must be corrected in a subsequent year or the receipt of a certificate of approval does not necessarily affect the status of a job otherwise complete. The record here is clear that additional work was necessary in 1984 relating to Job 553. Although the work required to correct deficiencies in Tangair Road should not serve to extend the completion date of the contract until 1984, we are convinced that work contemplated *512 in the contract had not been completed in 1983. Work performed in 1984 by the partnership in the instant case consisted of the following: putting numbers on power poles, placing shields on the runway lights, correcting defects arising with Tangair Road, removal and replacement of a curb, additional paving to provide turn-around space for a large jet, and the correction of problems relating to the remote switching capability of a generator that served as a back-up power source to the regular electrical power source for operation of the runway lights. It is obvious that the above work that the partnership and its subcontractors performed after 1983 was necessary for completion of the contract that the partnership and the Government entered into; failure of the partnership to complete such work would have put it in breach of the contract. Furthermore, the Government's acceptance of the job in March 1984 illustrates that the partnership needed to perform work in 1984 simply to complete their side of the bargain, and the Government viewed it as important. See sec. 1.451-3(b)(2)(i)(B), Income Tax Regs., quoted supra. Completion of the contract occurred when the client, the Government, *513 formally accepted the partnership's work, which was completed in 1984. As the regulation requires, "completion" is determined on the basis of all facts and circumstances. We note that the parties had originally contemplated a formal contract completion date of September 10, 1983. We also observe that the Government took occupancy of the runway and appurtenant facilities in August 1983, at which time the facilities were operational. However, the existence of meaningful work performed in 1984 that was integral to the contract convinces us that final completion and acceptance occurred in 1984, not 1983. Decision will be entered for the petitioner.
Footnotes
1. All statutory references are to the Internal Revenue Code, as in effect for the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩